IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| KATHLEEN O'DONNELL, | : | CIVIL ACTION |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 16-2040 |
| | : | |
| KATHRYN KNOTT, *et al.* | : | |
| | : | |
| *Defendants*. | : | |

_____:

**Goldberg, J.**                                                                    **October 4, 2017**

## MEMORANDUM OPINION

Plaintiff, Kathleen O'Donnell, a private citizen, alleges that Defendants Kathryn Knott and Karl Knott used Karl Knott's position as Chief of Police to enlist certain individuals within the Bucks County District Attorney's Office (Defendants David Heckler, Martin McDonough, and Mark Zielinksi) to assist in silencing Plaintiff's protected speech on social media. Presently before me is a motion to dismiss for failure to state claims filed by Defendants Heckler, McDonough, Zielinski, and Bucks County (the "County Defendants"). Defendants Kathryn and Karl Knott (the "Knotts") have also filed a motion to dismiss for failure to state claims. For the reasons that follow, all claims against Bucks County will be dismissed. Both motions will be denied in all other respects.

## I.        FACTUAL & PROCEDURAL BACKGROUND[1]

On September 11, 2014, Kathryn Knott was involved in an altercation wherein two gay men were assaulted in Philadelphia, Pennsylvania. The incident received extensive news coverage,

_____

[1] The following facts, viewed in the light most favorable to Plaintiff, are derived from Plaintiff's First Amended Complaint, as well as her "more definite statement," which I ordered pursuant to Federal Rule of Civil Procedure 12(e) and the United States Court of Appeals for the Third Circuit's decision in Thomas v. Independence Township, 463 F.3d 285 (3d Cir. 2006). (See Doc. No. 20.) All reasonable inferences will be drawn in favor of Plaintiff, the non-moving party.

which allegedly included Kathryn Knott's public statements on social media regarding her "proclaimed disgust with homosexuals." Kathryn Knott was subsequently arrested, convicted, and sentenced to a term of imprisonment for her participation in the assault. (Am. Compl. ¶¶ 11–14.)

On September 26, 2014, having heard about Kathryn Knott through various news media outlets, Plaintiff created a user account on the social media website "Disqus.com." According to Plaintiff, "Disqus.com is an online social media website, which is very similar to Twitter, where users post [ ] comments on news articles." Plaintiff's username for the account was "Knotty is a Tramp." She asserts that she created the account to parody Kathryn Knott's behavior, and used the account to satirically comment on "a number of current events." The profile picture for the account was an "extremely unflattering, publicly available photo, which showed Ms. Knott drinking directly from a large bottle of alcohol with her eyes closed." (Am. Compl. ¶¶ 16–17.)

The complaint notes that Kathryn Knott is the daughter of Karl Knott, who, at all times relevant to this litigation, was the Chief of Police for Chalfont, Pennsylvania (a borough located in Bucks County). Plaintiff alleges that Kathryn Knott informed her father of the Knotty is a Tramp social media account with "the expectation that her father would use his influence as a Chief of Police . . . to silence the person" behind the profile. Karl Knott allegedly contacted the Bucks County District Attorney's Office to assist him and his daughter in identifying the person behind the Knotty is a Tramp account. A meeting was allegedly arranged wherein Mr. Knott attempted to "convince individuals" within the District Attorney's Office to force the person behind the account to "cease publication." (Am. Compl. ¶¶ 18–20.)

On March 23, 2015, subsequent to this alleged meeting, Defendants Martin McDonough and Mark Zielinski, both detectives (collectively "the detectives"), allegedly met with Kathryn Knott at her home, where she provided additional information regarding the account's postings.

Thereafter, Plaintiff claims that the Bucks County District Attorney's Office identified her as the operator of the social media account by "identifying the locations from which she published materials on the account." The detectives then allegedly obtained a court order for the IP addresses used to post the comments linked to the account. Based on that information, Plaintiff insists that it was readily apparent that she "did not live, work, or publish any material . . . from within Bucks County, but rather that all materials were published from where [Plaintiff] lived in Montgomery County, Pennsylvania, and where she worked in Chester County, Pennsylvania." Nevertheless, she claims that Defendant David Heckler—who was at that time the District Attorney for Bucks County—directed the detectives to "confront" Plaintiff in retaliation for her posts under the Knotty is a Tramp username. (Am. Compl. ¶¶ 22, 39.)

On August 6, 2015, the detectives allegedly traveled outside of their territorial jurisdiction to Plaintiff's workplace, which was located in Chester County. Plaintiff claims that the detectives first approached her boss and spoke with him in a private meeting. They informed him that Plaintiff had "assumed the identity" of Kathryn Knott by posting under the Knotty is a Tramp profile, and that she was using the account to post harassing comments about Kathryn Knott. They further advised Plaintiff's boss that she had been posting some of this material from a computer in her workplace. The detectives apparently did not ask any questions of Plaintiff's boss, but merely conveyed the information outlined above. (Am. Compl. ¶¶ 23–25.)

At the conclusion of this meeting, the detectives asked Plaintiff's boss to bring Plaintiff into the room. The boss remained in the room as the detectives confronted Plaintiff about the Knotty is a Tramp account. During this exchange, Plaintiff admitted to operating the account and using it to "comment on various items in the news." She claims the detectives then "threatened . . . that if she continued to publish under the username . . . she would be arrested for 'fraudulently

3

impersonating Ms. Knott.'" Plaintiff asserts that the detectives also insinuated—in front of Plaintiff's boss—that if Plaintiff continued the postings, "charges would be filed" against her, and her employer "would be publicly linked" to the account. (Am. Compl. ¶ 26.)

Fearing arrest, Plaintiff acquiesced to the detectives' demands and agreed to stop posting comments under the Knotty is a Tramp username. At that point, Plaintiff was directed to leave the room. The detectives continued speaking with Plaintiff's boss, and allegedly informed him that Plaintiff had previously been cited for "excessively harassing a bakery near where she worked." Plaintiff's employment was terminated immediately following the detectives' visit to her workplace. (Am. Compl. ¶¶ 30–31.)

Plaintiff advances six counts in her Amended Complaint: First Amendment retaliation pursuant to 42 U.S.C. § 1983 and § 1988 (Counts I & II); prior restraint of her free speech pursuant to 42 U.S.C. § 1983 and § 1988 (Counts III & IV); and civil conspiracy under Pennsylvania common law (Counts V & VI).

Defendants McDonough and Zielinski, Defendant Heckler, and Bucks County have all moved to dismiss each of the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants Kathryn and Karl Knott have similarly moved to dismiss the two conspiracy claims against them pursuant to Rule 12(b)(6).

## II.    <u>LEGAL STANDARD</u>

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." <u>Id.</u> While it "does not impose a probability

requirement at the pleading stage," plausibility does require "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a claim." Phillips v. Cty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted). Courts must construe the allegations in a complaint "in the light most favorable to the plaintiff." Id. at 220.

In evaluating a motion to dismiss, courts generally consider only the allegations contained in the complaint, the exhibits attached thereto, and matters of public record. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 567 (3d Cir. 2002). "[A] complaint may not be dismissed merely because it appears unlikely that [a] plaintiff can prove those facts or will ultimately prevail on the merits." Connelly v. Lane Const. Corp., 809 F.3d 780, 790-91 (3d Cir. 2016) (quoting Phillips, 515 F.3d at 231).

### III.   ANALYSIS – COUNTY DEFENDANTS' MOTION TO DISMISS

#### A. Absolute Immunity – Defendant David Heckler

Defendant Heckler argues that he is entitled to absolute immunity. He posits that "prosecutors are absolutely immune from civil liability for activities intimately associated with the judicial phases of the criminal process," and that, as District Attorney, his "investigation into

criminal charges are acts within the scope of a prosecutor's duties." (Defs.' Mot. to Dismiss 13–14.)

Plaintiff responds that Heckler's actions fell outside the scope of activities "intimately associated" with the judicial phases of the criminal process for two reasons. First, Plaintiff avers that Heckler knowingly directed Detectives McDonough and Zielinski to travel outside of their territorial jurisdiction in violation of 42 Pa. Con. Stat. § 8953(a)(1)-(6) "to detain, question, and threaten" Plaintiff.[2] Second, Plaintiff highlights the Third Circuit's decision in Odd v. Malone, which recognized that "absolute immunity does not attach to investigatory actions of a prosecutor which are not related to initiating and conducting judicial proceedings." 538 F.3d 202, 208 (3d Cir. 2008).

Absolute immunity is an affirmative defense. A complaint may be subject to dismissal under Rule 12(b)(6) only when an affirmative defense appears (i.e., is established) on the face of a complaint. Shultz v. Allegheny Cty., 835 F. Supp. 2d 14, 24 (W.D. Pa. 2011) (citing ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994)). The Third Circuit has recognized that a prosecutor bears a "heavy burden" of establishing entitlement to absolute immunity, and there is an initial presumption that qualified, rather than absolute, immunity is appropriate. Light v. Haws, 472 F.3d 74, 80–81 (3d Cir. 2007); Carter v. City of Philadelphia, 181 F.3d 339, 355 (3d Cir. 1999) (citing Burns v. Reed, 500 U.S. 478, 486–87 (1991)).

Absolute immunity attaches only to those actions "intimately associated with the judicial phases of litigation," but not to "administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." Odd, 538 F.3d at 208 (citing Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). A court must first ascertain "just what conduct forms the basis for the plaintiff's

---

[2] This statute outlines certain circumstances in which a municipal police officer may enforce the laws of the Commonwealth of Pennsylvania while outside the territorial limits of his or her primary jurisdiction.

cause of action," and then determine which function (prosecutorial, investigative, administrative, or something else entirely) that act served. Schneyder v. Smith, 653 F.3d 313, 332 (3d Cir. 2011).

Here, Plaintiff claims that Heckler directed the two detectives to confront her—at a location outside of their territorial jurisdiction—in retaliation for her posts on social media. She alleges that he directed the detectives to confront Plaintiff at her place of work (rather than at home), and to intimate to her boss that the employer could receive negative publicity as a result of Plaintiff's online posts. (Am. Compl. ¶¶ 39–43.)

Assuming the veracity of these allegations, and viewing them in the light most favorable to Plaintiff, I conclude that, at this early stage of the case, a ruling on Heckler's entitlement to absolute immunity would be premature. It is not clear from the face of Plaintiff's Amended Complaint that Heckler is entitled to absolute immunity because Plaintiff's factual allegations plausibly depict a situation in which Hecker's conduct could, if proven, amount to a function that was not prosecutorial or otherwise "intimately associated with the judicial phases of litigation" (i.e., Heckler's conduct arguably falls into the category of "something else entirely"). Schneyder, 653 F.3d at 332.

Heckler's argument that his "investigation into criminal charges" was within the scope of a prosecutor's duties may, ultimately, prove to be true. (Defs.' Mot. to Dismiss 14). However, courts have recognized that immunity does not attach to "administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." Odd, 538 F.3d at 208; see also Zimmerman v. Corbett, 2015 WL 539783, at *10 (M.D. Pa. Feb. 10, 2015) (same). Because Plaintiff's complaint plausibly alleges conduct that is unrelated to initiating and conducting judicial proceedings, Heckler's argument that he is entitled to absolute immunity is premature.[3]

---

[3] Defendant Heckler may re-raise the defense of absolute immunity at the summary judgment stage if discovery reveals admissible evidence that he believes supports this defense.

**B.** **Qualified Immunity – Defendants McDonough and Zielinski; and Plaintiff's First Amendment Retaliation Claims (Counts I & II)**

Defendants McDonough and Zielinski (collectively "the detectives") argue that they are entitled to qualified immunity because the complaint does not plausibly allege that they violated Plaintiff's clearly established First Amendment rights. (Defs.' Mot. to Dismiss 14–18.)

State officials performing discretionary acts enjoy "qualified immunity" from civil damages in § 1983 causes of action when their conduct does not violate "clearly established" statutory or constitutional rights of which a "reasonable person" would have been aware at the time the incident occurred. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009); Kelly v. Borough of Carlisle, 544 F. App'x 129, 133–34 (3d Cir. 2013).

"Qualified immunity is immunity from suit, and should be resolved as early as possible." Docherty v. Cape May Cty., 2017 WL 2819963, at *6 (D.N.J. June 29, 2017). The Third Circuit has stated that, at the pleading stage, "qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." Thomas v. Indep. Twp., 463 F.3d 285, 291 (3d Cir. 2006) (citing Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001)). "The burden of establishing qualified immunity falls to the official claiming it as a defense." Burns v. PA Dep't of Corr., 642 F.3d 163, 176 (3d Cir. 2011).

The United State Supreme Court relies on a two-part test to decide whether qualified immunity applies. See Saucier v. Katz, 533 U.S. 194 (2001). The first part asks whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Saucier, 533 U.S. at 201. If a plaintiff's factual allegations

8

depict a violation of her rights, a court must determine whether the right was "clearly established." Id. at 201–02; Williams v. Sec'y Pennsylvania Dep't of Corr., 848 F.3d 549, 557 (3d Cir. 2017). The Supreme Court has stated that these steps may be addressed in whatever order the district court determines to be suitable based on the particular circumstances of a case. But it will often be appropriate to address the constitutional violation first. Pearson, 555 U.S. at 236.

Here, the detectives argue that Plaintiff's speech was defamatory, and is therefore not protected by the First Amendment (i.e., they did not violate her constitutional rights), and that her conduct amounted to identity theft, which also renders her speech unprotected. (Defs.' Mot. to Dismiss 26–27.) Additionally, they argue that even if Plaintiff's speech was protected, her rights were not "clearly established" because it would not be clear to a reasonable detective that the detectives' conduct was unlawful, given that they simply "investigated a complaint made by a credible witness, Chief Knott, that turned out to be true[.]" (Id. at 18.)

a. Part One: Violation of a Constitutional Right

The First Amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment's Free Speech Clause is applicable to the States under the Due Process Clause of the Fourteenth Amendment. Packingham v. North Carolina, 137 S. Ct. 1730, 1733 (2017).

"In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006).

i.  *Constitutionally Protected Conduct*

Plaintiff alleges that she created the Knotty is a Tramp profile to parody Kathryn Knott's behavior, and to satirically comment on various news items.[4] Plaintiff did not include in her Amended Complaint any of the actual comments posted under the profile, and the detectives highlight this point in their motion to dismiss. Thus, to address the qualified immunity issue at the "earliest possible stage," I ordered Plaintiff to provide a more definite statement in the form of a list of all of the comments posted under the account. See Federal Rule of Civil Procedure 12(e); Thomas v. Indep. Twp., 463 F.3d 285 (3d Cir. 2006).

In response, Plaintiff submitted a log of comments totaling approximately fifty (50) pages. Several comments appear to pertain either directly or indirectly to Kathryn Knott. But many of the other comments do not specifically refer to Kathryn Knott.[5] Several comments pertain to political figures and other current events, and many appear to be either responses or replies to other comments posted by other users on the social media platform. Plaintiff does not allege anywhere in her Amended Complaint that she ever attempted to (or actually did) contact Kathryn Knott directly via the Knotty is a Tramp account, or by any other means.

The following is a representative sample of the comments posted under the Knotty is a Tramp profile that do appear to either directly or indirectly pertain to Kathryn Knott:

I'm an entitled princess who can beat up gay people if I want to.

My chief of police father is disappointed in me.

I brutally beat up two guys with my mob of 12

---

[4] "Satire is a long-established artistic form that uses means such as ridicule, derision, burlesque, irony, parody, [or] caricature to censure the vices, follies, abuses, or shortcomings of an individual or society. . . . A parody is to the same effect: the style of an individual or work is closely imitated for comic effect or in ridicule." Farah v. Esquire Magazine, 736 F.3d 528, 536 (D.C. Cir. 2013) (internal quotation marks omitted).

[5] I recognize Defendants' position to be that *all* of the comments implicate Kathryn Knott because of the name of the profile, the picture associated with it, and Plaintiff's use of the first person in making various comments.

Don't know what drove me to my crimes except a good life and plenty of alcohol.

I'm not diverse and I'm in trouble. Had the good life, with daddy being the chief of police. Now it's all downhill.

Didn't you see my mug shot in Philadelphia. I look good in my pink hoodie. So not looking forward to wearing orange.

[M]y violent nature was ignored because I blend in, until the video caught me.

I'm an entitled princess who does not deserve to be charged with the beat down of some gay guys.

Yeah, I thought I was exercising my free speech when I beat up some guys.

Makeup does wonders. My mug shot was the pits.

I'm not guilty, even if they have me on video.

[D]on't call me sweetie. My name is Knotty.

That's why I should get off because daddy is a chief of police.

You lowlife beoyatch. It's the real deal which is why daddy is mad that his little girl screwed up.

I hope I get that judge. We entitled princesses deserve a slap on the wrist too.

I'm practicing … lap dancing so I can get a job to buy more booze.

I should get an Oscar for the performance I put on, crying after the liquor cabinet key was taken away.

Hope I can get a job soon cause I need more booze.

I would apply for food stamps but the liquor stores won't accept them.

I don't know why the right wingers aren't supporting me. I'm an entitled princess not a thuggette like the new people are calling me. Only beat up some guys that deserved it because of their life choices.

My daddy the chief of police will get me out of those charges because I'm an entitled girl and don't deserve any charges or jail time. Orange doesn't suit my complexion.

I'm not guilty either. I have mental issues that caused me to … beat up those two guys.

> I'll be getting some striped pajamas or some orange ones for Christmas. Hope I can model them on twitter.

(Doc. No. 21.)

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." B.H. ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 302 (3d Cir. 2013) (quoting Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)); Hartman v. Moore, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."). Although this principle is not absolute, the First Amendment "protects speech regardless of whether it is disruptive, offensive, vulgar, or insulting." J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 936 (3d Cir. 2011) (Smith, J., concurring); Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282–83 (3d Cir. 2004).

"The inquiry into the protected status of speech is one of law, not fact." Connick v. Myers, 461 U.S. 138, 148 n.7 (1983); Mink v. Knox, 613 F.3d 995, 1007 (10th Cir. 2010) ("[W]hether a statement could be reasonably understood as fact [as opposed to parody or satire] is a question of law."); Farah v. Esquire Magazine, 736 F.3d 528, 535 (D.C. Cir. 2013) (same).

In support of their argument that Plaintiff's speech was unprotected, the detectives cite to the Pennsylvania Superior Court's decision in AmerisourceBergen Corporation v. Does, 81 A.3d 921 (Pa. Super. 2013). There, someone commented on an online article about a possible corporate merger posing as a man named "Neil Herson." The comments stated:

> Hassel's margin and EPS analysis is spot on. However, the other issue is working capital. Medco is a very fast payer—so fast that ABC operates in a very POSITIVE working capital position on its business. If Medco leaves, expect a $300–500 million cash hit to

12

> ABC…. ABC sells a little over $300 million per business day. Cash on hand is 5 to 7 days of revenue. Operating cash flow is 3 to 4 days of revenue. With $4 billion of A/R, bad debt risk relative to cash is notable. Yes, ABC's cash balance appears substantial, however interesting to view in the above context.

AmerisourceBergen Corp., 81 A.3d at 924. Neil Herson happened to be the president of a subsidiary of ABC, and neither he nor ABC authorized the comments above. The Superior Court observed that the person behind the statements did not use a "fictitious or pen name when posting the comments," but rather used (without his permission) the "name of a real person in an executive position with one of ABC's affiliates." Thus, the poster "falsely attributed the postings to Neil Herson," which the court determined to be unprotected speech. Id. at 929.

However, the court distinguished the facts of that case from several others wherein courts recognized that satire and parody constitute protected categories of speech under the First Amendment:

> The comments at issue herein were not manifestly satiric, ironic, or sardonic. Moreover, they were not posted in the name of an entire company, which manifestly would be unlikely to make such comments, but rather in the name of one person who might be expected to be well-informed regarding the information related in the commentary, and who might be expected to have a personal interest in making certain impressions with the investing public.
>
> . . .
>
> The comments in question do not constitute obvious satire, and were not such that a reasonable reader could be expected to recognize that Mr. Herson's name was used ironically or as part of protected commentary on an issue of public importance. Nor were the comments anonymous or pseudonymous, which are the only categories of commentary clearly protected by the case law discussed herein.

AmerisourceBergen Corp., 81 A.3d at 929–932.

Plaintiff argues in response that AmerisourceBergen is distinguishable because the comments at issue before me constitute "obvious satire," which the AmerisourceBergen court

13

recognized as protected speech. In further support of her position that her speech is protected, Plaintiff cites to the United States Supreme Court's decision in <u>Hustler Magazine, Inc. v. Falwell</u>, 485 U.S. 46 (1988). In <u>Falwell</u>, a nationally recognized pastor, Jerry Falwell, sued *Hustler Magazine* for libel and intentional infliction of emotional distress based on an ad that the magazine had run on its inside front cover. The "parody ad" was entitled, "Jerry Falwell talks about his first time" (alluding to his first sexual encounter), and included a fake interview with Falwell. In this fake interview, the ad indicated that Falwell's "first time" was "during a drunken incestuous rendezvous with his mother in an outhouse." <u>Id.</u> at 48. In small print at the bottom of the page, the ad stated that it was "parody" and not to be taken seriously. <u>Id.</u>

On Falwell's libel claim, the jury found that the ad parody could not have "reasonably [been] understood as describing actual facts about [Falwell] or actual events in which [he] participated." <u>Falwell</u>, 485 U.S. at 49. The court of appeals interpreted the jury's finding to be that the ad "was not reasonably believable," and the Supreme Court upheld that finding. <u>Id.</u> at 49-50, 57. The Supreme Court further found that Falwell's intentional infliction of emotional distress claim also failed because, consistent with the First Amendment, the "outrageous" conduct in question was the "publication of a caricature" (i.e., an "ad parody"), and thus protected speech. <u>Id.</u> at 57.

The Supreme Court had, in prior decisions, similarly adhered to the principle that speech is protected when—viewed in the appropriate context—it does not reasonably state or imply an *actual* defamatory falsehood (i.e., a false statement of fact). <u>See</u> <u>e.g.</u>, <u>Greenbelt Co-op. Pub. Ass'n v. Bresler</u>, 398 U.S. 6, 13 (1970) ("[W]e hold that the imposition of liability . . . was constitutionally impermissible—that as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported in the [news] . . . .

[E]ven the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the real estate developer's] negotiating position extremely unreasonable."); Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin, 418 U.S. 264, 286 (1974) ("[I]n the context of this case, no such factual representation can reasonably be inferred" because "use of words like 'traitor' cannot be construed as representations of fact."); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) ("[T]he Bresler–Letter Carriers–Falwell line of cases provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual. . . . This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation.") (citations omitted).

More recent federal circuit decisions have continued adherence to the principle that speech is protected when, viewed in the appropriate context, it does not reasonably purport to state an actual fact about the party asserting defamation. A brief review of these cases is warranted as they confronted speech similar to the speech at issue here.

The United States Court of Appeals for the Third Circuit's *en banc* decision in J.S. ex rel. Snyder v. Blue Mountain School District focused primarily on whether a student's off-campus speech could have reasonably been forecasted to cause a "substantial disruption" in school. However, certain observations by the majority with respect to the protected status of the speech at issue in that case are directly relevant to speech at issue here. 650 F.3d 915 (3d Cir. 2011).

In J.S. ex rel. Snyder, a middle-school student created a fake "MySpace" profile of her principal. Though the profile did not name the principal directly, the photograph for the profile was the principal's "official photograph" taken from the school's website. J.S. ex rel. Snyder, 650

F.3d at 920. "The profile was presented as a self-portrayal" of a bisexual principal, and "contained crude content and vulgar language, ranging from nonsense and juvenile humor to profanity and shameful personal attacks aimed at the principal and his family." Id. at 920. The profile listed the principal's general interests as: "detention, being a tight ass, . . . spending time with my child (who looks like a gorilla), baseball, my golden pen, fucking in my office, [and] hitting on students and their parents." Additionally, the profile stated in the "About me" section:

> HELLO CHILDREN[.] yes. it's your oh so wonderful, hairy, expressionless, sex addict, fagass, put on this world with a small dick PRINCIPAL[.] I have come to myspace so i can pervert the minds of other principal's [sic] to be just like me. I know, I know, you're all thrilled[.] Another reason I came to myspace is because— I am keeping an eye on you students (who[m] I care for so much)[.] For those who want to be my friend, and aren't in my school[,] I love children, sex (any kind), dogs, long walks on the beach, tv, being a dick head, and last but not least my darling wife who looks like a man (who satisfies my needs)[.]

J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 921 (3d Cir. 2011).

The Third Circuit observed that the record indicated "the profile was so outrageous that <u>no one took its content seriously</u>. . . . The School District point[ed] to no evidence that anyone ever suspected the information in the profile to be true." J.S. ex rel. Snyder, 650 F.3d at 921 (emphasis added). The court went on to find that the school district's disciplinary action against the student for creating the profile violated her First Amendment rights.

The majority also noted that—as a matter of law—the principal "could not succeed in his claim that the profile violated his right to be free from defamation." J.S. ex rel. Snyder, 650 F.3d at 921 n.9 (citing Falwell). Multiple judges concurring in the judgment agreed that the student's speech was protected as a matter of law. Id. at 940 (Smith, J., concurring) ("I agree with the majority that this was protected speech. The speech was not defamatory, obscene, or otherwise unprotected.") (citing Falwell).

16

Outside of the Third Circuit, both the United States Court of Appeals for the District of Columbia Circuit and the United States Court of Appeals for the Tenth Circuit have reached similar conclusions when presented with comparable facts. See e.g., Farah v. Esquire Magazine, 736 F.3d 528 (D.C. Cir. 2013); Mink v. Knox, 613 F.3d 995 (10th Cir. 2010).

In Mink v. Knox, a university student created a fictional character, "Junius Puke," for the editorial column of his internet-based journal. The column displayed altered photographs of Junius Peake, a professor of finance at the university. The student's column—in which Junius Puke claimed to be the "editor," and wrote in the first person—addressed "subjects on which Mr. Peake would be unlikely to write, in language he would be unlikely to use, asserting views that were diametrically opposed to Mr. Peake's." Mink, 613 F.3d at 998, 1008. For example, the column stated that "[t]his will be a regular bitch sheet that will speak truth to power, obscenities to clergy, and advice to all the stoners sitting around watching Scooby Doo," and "I [Junius Puke] made it to where I am through hard work, luck, and connections, all without a college degree." Id. at 1008.[6] The professor contacted the local police, who began investigating the student for potentially violating Colorado's criminal libel statute. The police searched the student's residence and seized his personal computer and other written materials that referenced the journal, which prompted the student to file a federal lawsuit.

In assessing qualified immunity on the district attorney's motion to dismiss, the Tenth Circuit held that the student had adequately articulated a violation of his First Amendment rights

---

[6] The journal did contain a disclaimer stating that Junius Puke should not be confused with Junius Peake, who was an "upstanding member of the community" and an "asset" to the university's business school. Id. at 1009.

because "the comments asserted [to be] defamation constituted satire in its classic sense," and were thus protected by the First Amendment. <u>Mink</u>, 613 F.3d at 1009.[7]

Here, the Knotty is a Tramp profile does not use Kathryn Knott's first name. Moreover, like the plaintiff in <u>Mink</u> and unlike the appellant in <u>AmerisourceBergen</u>, the profile uses only a variation of her last name. The profile also refers to "Knotty" in the third person, and uses an unambiguously derogatory and insulting term to characterize her—"Tramp," which the Merriam-Webster Dictionary defines as a "woman of loose morals" or a "prostitute." (https://www.merriam-webster.com/dictionary/tramp) (last visited, September 21, 2017). Thus, in reviewing the profile itself, I conclude that it is entirely plausible that a reasonable reader would *not* believe that Kathryn Knott actually created this profile and used it to comment on articles about herself.

Regarding the comments, and when viewed in the same context, I similarly conclude that it is entirely plausible that a reasonable reader would *not* believe that Kathryn Knott would publicly refer to herself as an "entitled princess who can beat up gay people if she wants to," that she should not be criminally prosecuted because her "daddy is a chief of police," that she was "practicing lap dancing" to "get a job to buy more booze," and/or that she hoped she could "model" her "striped" or "orange" pajamas (i.e., prison attire) on Twitter when she gets them for Christmas. Put another way, unlike the plaintiff in <u>AmerisourceBergen</u> who falsely attributed statements to someone who "might be expected" to make such statements, it is plausible that a reader of the above-mentioned comments would not reasonably understand them to be making

---

[7] The Tenth Circuit also reiterated that the appropriate inquiry for determining whether speech is protected as satire is "whether the charged portions [of speech], in context, could be reasonably understood as describing actual facts about the [party asserting defamation]." <u>Mink</u>, 613 F.3d at 1006. And "[t]he test of what a particular statement could reasonably be understood to have asserted is what a reasonable reader would understand the author to be saying, considering the kind of language used and the context in which it is used." <u>Id.</u> at 1007. Thus, "[e]ven false statements of fact are protected [under the First Amendment] if any reasonable person would recognize he statements as parody." <u>Id.</u> at 1005.

*actual* statements of fact about Kathryn Knott, and thus would not take them seriously. J.S. ex rel. Snyder, 650 F.3d at 921; AmerisourceBergen Corp., 81 A.3d at 929–932; see also Farah, 736 F.3d 528; Mink, 613 F.3d 995.

Accordingly, taken as true, and when viewed in the light most favorable to her, Plaintiff has articulated sufficient facts to plausibly suggest that she engaged in constitutionally protected conduct under the First Amendment. Therefore, with respect to the detectives' qualified immunity defense, they have not met their burden (at this stage) of demonstrating that Plaintiff's speech was unprotected, either as defamatory or because she "assumed" Kathryn Knott's identity.

ii.   *Retaliatory Action*

The second element in a First Amendment retaliation claim requires some type of retaliatory or adverse action (i.e., something sufficient to deter a person of ordinary firmness from exercising her constitutional rights).

Here, Plaintiff alleges that the two detectives threatened her with arrest if she continued posting under the Knotty is a Tramp username, and she only agreed to cease publication out of fear of being arrested. She further asserts that the detectives confronted her at her job (instead of her home), met privately with her boss before speaking with her, advised the boss that Plaintiff had previously been cited for "harassing" a bakery, and insinuated to him that the employer could receive negative publicity given that Plaintiff had posted certain comments from her work computer.

Taken as true, and viewed in the light most favorable to Plaintiff, I conclude that the detectives' conduct was "sufficient to deter a person of ordinary firmness from exercising her constitutional rights." It is difficult to imagine a more direct method of deterring a person from

exercising her constitutional rights than by threatening to deprive her of her liberty. Therefore, Plaintiff has pled sufficient facts to articulate retaliatory action.

       iii. *Causal Connection*

The third and final element in a claim for First Amendment retaliation is a causal link between the constitutionally protected conduct and the retaliatory action. Here, the parties do not appear to dispute the sufficiency of Plaintiff's allegations that the detectives confronted Plaintiff as a result of her posting under the Knotty is a Tramp username. Nor do they dispute the sufficiency of Plaintiff's allegations that Karl Knott contacted the Bucks County District Attorney's Office seeking to identify the speaker behind the account. My independent review of the complaint also reflects that, taken in the light most favorable to Plaintiff, she has pled sufficient facts to articulate a causal connection between her protected activity and the alleged retaliatory action.

In sum, at this early stage of the case, Plaintiff has pled sufficient facts to adequately articulate a violation of her constitutional rights under the first part of a qualified immunity analysis.[8] However, as noted *supra*, a government official may be entitled to qualified immunity *even if* he violated a citizen's constitutional rights, so long as the right at issue was not "clearly established" at the time he violated it. Lane v. Franks, 134 S. Ct. 2369, 2381 (2014) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.") (quotations omitted). Thus, under the second part of the test for qualified immunity, I must now assess whether the First Amendment right that Plaintiff has plausibly alleged was violated, was "clearly established" at the time it was allegedly violated. Williams v. Sec'y Pennsylvania Dep't of Corr., 848 F.3d 549, 557 (3d Cir. 2017).

---

[8] To the extent that the County Defendants argue Plaintiff has failed to plead sufficient facts to make out plausible First Amendment retaliation claims (Counts I and II), their motion will be denied for the same reasons outlined herein.

b. <u>Part Two: Was Plaintiff's Right "Clearly Established"?</u>

The second inquiry in assessing whether a government official is entitled to qualified immunity asks whether a plaintiff's right was "clearly established"—that is, whether the contours of the right were already delineated under the current state of the law with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. "[T]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." <u>Burns v. PA Dep't of Corr.</u>, 642 F.3d 163, 176 (3d Cir. 2011) (internal quotations omitted); <u>Bradley v. W. Chester Univ. of Pennsylvania State Sys. of Higher Educ.</u>, 226 F. Supp. 3d 435, 448–49 (E.D. Pa. 2017) ("[T]he very action in question need not have been found previously unlawful, but, in the light of pre-existing law, the unlawfulness must be apparent" and "beyond debate") (internal quotations omitted); <u>Halsey v. Pfeiffer</u>, 750 F.3d 273, 295 (3d Cir. 2014) ("[W]hat is required is that government officials have 'fair and clear warning' that their conduct is unlawful.") (internal quotations omitted).

Here, the detectives must establish that reasonable detectives in their position at the time would not have known that their conduct in confronting and threatening Plaintiff with arrest constituted a violation of her First Amendment rights. <u>Halsey v. Pfeiffer</u>, 750 F.3d 273, 288 (3d Cir. 2014). They argue that the "language of [Plaintiff's] posts, coupled with the photograph of Ms. Knott, does not <u>clearly</u> indicate to the reader that the language is meant to be satirical commentary, as the posts were written in the first person, [and] posted next to a profile picture of Ms. Knott, the alleged author." (Defs.' Mot. to Dismiss 17) (emphasis in original).

The detectives cite to just one case in support of their argument that Plaintiff's right was not "clearly established," <u>Banks v. Machesky</u>, No. 13-cv-781, 2015 WL 412914 (W.D. Pa. Jan.

30, 2015). In <u>Banks</u>, the *pro se* plaintiff sent text messages to his ex-fiancé, and the defendant police officer "telephoned" him and allegedly "threatened" him with harassment charges if the plaintiff continued to contact his former fiancé. <u>Id.</u> at *1. The plaintiff filed suit alleging, *inter alia*, that the officer's conduct violated his First Amendment rights. The district court found that, while the plaintiff had alleged a violation of his First Amendment rights, the officer was nevertheless entitled to qualified immunity because the officer was "simply doing his job" in responding to a complaint that had been filed with the police department (presumably by the plaintiff's ex-fiancé) <u>Id.</u> at *7.

The facts of the case before me are distinguishable. The plaintiff in <u>Banks</u> alleged that he made direct contact with his ex-fiancé, and, while it is not entirely clear from the opinion, it appears that the ex-fiancé complained to the police department in an attempt to stop the perceived harassment. The officer then threatened the plaintiff with "harassment charges" if he continued to send the text messages. <u>Id.</u>

Here, Plaintiff does not allege that detectives threatened her with harassment charges. Indeed, as mentioned above, Plaintiff does not allege that she ever attempted to, or actually did, make direct contact with Kathryn Knott. Thus, it is entirely plausible that the detectives, unlike the officer in <u>Banks</u>, could not reasonably have believed that they were responding to a legitimate complaint of harassment.

Plaintiff alleges that the detectives threatened to file criminal charges against her, not for harassment but rather for "fraudulently impersonating" Kathryn Knott. (Am. Compl. ¶ 26.) But, as discussed above, it seems entirely plausible that no reasonable reader of the statements made through the Knotty is a Tramp social media account would actually attribute those statements as

coming from Kathryn Knott, or, that the posts purported to convey actual statements of fact about Kathryn Knott.

Long before the detectives' visit to Plaintiff's work occurred on August 6, 2015, both Pennsylvania and the federal courts recognized that speech which cannot reasonably be taken as stating actual facts is afforded protection as parody/satire under the First Amendment. Therefore, the preexisting precedent placed this particular constitutional question "beyond debate." Because the contours of the right were already delineated under the current state of the law, and when the facts recited above are taken in the light most favorable to Plaintiff, it is plausible that a reasonable detective should have been aware that what he was doing violated a constitutional right.[9] Accordingly, I conclude that Plaintiff's right was "clearly established."

In sum, Plaintiff has sufficiently alleged a violation of her clearly established constitutional rights. Accordingly, the detectives' qualified immunity defense will be denied, without prejudice.[10]

## C.  Prior Restraint of Free Speech (Counts III & IV)

Defendants McDonough, Zielinski, and Heckler also argue that Plaintiff has failed to plead sufficient facts to articulate plausible claims for "prior restraint of free speech." (Defs.' Mot. to Dismiss 28.) Once again, they argue that Plaintiff was "not denied a constitutionally protected right, as she has no legal right to assume another person's identity and make malicious statements about the person whose identity she assumed[.]" (Id.) I incorporate by reference those relevant portions of my analysis above pertaining to the protected status of Plaintiff's speech.

---

[9] While Defendant Heckler only argued that he was entitled to absolute immunity, to the extent the "presumption of qualified immunity" applies, my analysis with respect to the detectives applies with equal force to Heckler.

[10] The detectives may re-raise the defense of qualified immunity at the summary judgment stage if discovery reveals admissible evidence that they believe supports this defense.

Whereas First Amendment retaliation punishes speech that has already occurred, prior restraint of speech seeks to prevent speech from being expressed to begin with. Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1209 (10th Cir. 2007) ("[U]nlike an adverse action taken in response to actual speech, [a prior restraint] chills potential speech before it happens.").

"A government entity . . . is not permitted to employ threats to squelch the free speech of private citizens." Backpage.com, LLC v. Dart, 807 F.3d 229, 235 (7th Cir. 2015) (Posner, J.), cert. denied, 137 S. Ct. 46 (2016); Fairley v. Andrews, 578 F.3d 518, 525 (7th Cir. 2009) ("Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation."). The United States Supreme Court has stated that even "informal procedures undertaken by officials and designed to chill expression can constitute a prior restraint." Multimedia Holdings Corp. v. Circuit Ct. of Fla., St. Johns Cnty., 544 U.S. 1301, 1306 (2005).

Here, Plaintiff alleges that McDonough, Zielinski, and Heckler not only retaliated against her as a result of her protected speech, but also threatened her with arrest if she continued posting under the Knotty is a Tramp username. (See Am. Compl. ¶¶ 26, 30 ("[Plaintiff], fearing arrest, acquiesced to the Detectives' demands, agreeing to cease publishing under the 'Knotty is a Tramp' username.")) Taken in the light most favorable to Plaintiff, it is plausible that the Defendants' conduct amounted to a prior restraint of Plaintiff's First Amendment rights. See Backpage.com, LLC, 807 F.3d at 231 ("The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will . . . be imposed unless there is compliance with his demands."). As such, the County Defendants' motion will be denied as to Counts III and IV.

**D.  Pennsylvania Common Law Civil Conspiracy (Counts V and VI)**

Defendants McDonough, Zielinski, and Heckler argue that Plaintiff's common law civil conspiracy claims must be dismissed because she has failed to plead an underlying tort. (Defs.' Mot. to Dismiss 24-25.) Once again, Defendants insist that Plaintiff had no "constitutional right to assume [Kathryn Knott's] identity" and insofar as there is no constitutional violation, "there can be no conspiracy to commit such a violation." (Id. at 25.)

To state a claim for civil conspiracy under Pennsylvania law, a plaintiff must allege facts which, if proven, would establish the following: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. Pellegrino v. U.S. Transp. Sec. Admin., 855 F. Supp. 2d 343, 358 (E.D. Pa. 2012) (citing Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003)). Moreover, an "actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor." Levin v. Upper Makefield Twp., Bucks Cnty., Pa., 90 F. App'x 653, 667 (3d Cir. 2004) (citations omitted). "Ultimately, only a finding that the underlying tort has occurred will support a claim for civil conspiracy." Reese v. Pook & Pook, LLC., 158 F. Supp. 3d 271, 292 (E.D. Pa. 2016) (internal quotations omitted).

The Defendants' only argument with respect to the legal sufficiency of Plaintiff's conspiracy claims is that the required "independent wrong" (i.e., the predicate act giving rise to the conspiracy) has not been plausibly alleged. I disagree with Defendants: as discussed *supra*, Plaintiff has alleged plausible claims for both First Amendment retaliation and prior restraint of free speech. Therefore, Defendants' motion will be denied in this regard.

### E.  Immunity Under the Political Subdivision Pennsylvania Tort Claims Act

Defendants McDonough, Zielinski, and Heckler further insist that they are immune from Plaintiff's state law civil conspiracy claims pursuant to the Political Subdivision Pennsylvania Tort Claims Act (the "Tort Claims Act"). (Defs.' Mot. to Dismiss 23–24.) Specifically, they again urge that their "actions were not illegal, nor did they have reason to know that their actions were illegal[.]" (Id. at 24.) Plaintiff responds that the Defendants' alleged wrongdoing constituted "willful misconduct" under the Tort Claims Act, which is an enumerated exception to the general rule that public officials are entitled to immunity. (Pl.'s Resp. 21-22.)

Under the Tort Claims Act, municipal employees "are generally immune from liability to the same extent as their employing agency, so long as the act committed was within the scope of the employee's employment." Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006) (citing 42 Pa. Cons. Stat. § 8545). But the Tort Claims Act sets out an exception to this rule, denying immunity in any action against a local employee for damages due to an injury caused by the act of the employee where the act constituted "a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Con. Stat. § 8550; see also M.U. v. Downingtown High Sch. E., 103 F. Supp. 3d 612, 630 (E.D. Pa. 2015).

"[W]illful misconduct is a demanding level of fault," and has been defined by Pennsylvania courts as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." Sanford, 456 F.3d at 315 (citations omitted). The term has further been deemed synonymous with the term "intentional tort." Allen v. Dist. Attorney's Office of Phila., 644 F. Supp. 2d 600, 610–11 (E.D. Pa. 2009).

I incorporate by reference my discussion above with respect to whether or not a reasonable officer in the detectives' position (and, relevant here, a reasonable district attorney in Heckler's position) should have known that his conduct violated Plaintiff's clearly established constitutional rights. For the same reasons discussed *supra*, I conclude that Plaintiff has pled sufficient facts at this stage to plausibly suggest that the Defendants' alleged misconduct was "willful" within the meaning of the Tort Claims Act: Plaintiff alleges that Heckler directed the two detectives to travel outside of their territorial jurisdiction to confront Plaintiff at her place of work, rather than at her home; the detectives threatened her with arrest in front of her boss; the detectives insinuated to the boss that the employer could be publicly linked to the Knotty is a Tramp account and receive negative publicity as a result; and the detectives informed Plaintiff's boss that Plaintiff had previously been cited for "harassing" a bakery (a fact with no apparent legitimate relevance to Plaintiff's creation of the Knotty is a Tramp account).

Taken in the light most favorable to Plaintiff, not only did the Defendants plausibly commit a constitutional tort by infringing Plaintiff's First Amendment rights, but, in drawing all reasonable inferences in Plaintiff's favor, it appears that the Defendants' conduct was plausibly aimed at interfering with her employment as well. As noted, Plaintiff was fired immediately following the detectives' visit to her workplace. Therefore, Defendants' motion will be denied as to this argument.

**F.  Personal Liability of Defendants McDonough, Zielinski, and Heckler**

Defendants contend that Plaintiff has not pled sufficient facts to subject McDonough, Zielinski, or Heckler to personal liability. (Def. Mot. to Dismiss 19.) Plaintiff responds that she separately named each person as individual defendants in this case because she is asserting claims against all three in their individual capacities—not their official capacities. (Pl.'s Resp. 19.)

27

It is well established that 42 U.S.C. § 1983 subjects state officers to *personal* liability "for actions taken under color of state law." Hafer v. Melo, 502 U.S. 21, 25 (1991) (noting that "[p]ersonal-capacity [§ 1983] suits," in contrast to official-capacity suits, "seek to impose individual liability upon a government officer for actions taken under color of state law," and that "it is enough [to establish personal liability] to show that the official, acting under color of state law, caused the deprivation of a federal right"). Defendants do not appear to dispute the sufficiency of Plaintiff's allegations that they were acting under "color of state law" when they (as Plaintiff alleges) retaliated against her for exercising her First Amendment rights: Plaintiff alleges that the detectives presented themselves as detectives when they appeared at Plaintiff's workplace, and that Heckler, using his position as District Attorney, directed the detectives to confront Plaintiff.

And as with claims under § 1983, a government officer may be *personally* liable for a common law civil conspiracy claim, when such a claim is asserted against him in his personal capacity. See, e.g., Ickes v. Grassmeyer, 30 F. Supp. 3d 375, 402-403 (W.D. Pa. 2014) (denying motion to dismiss civil conspiracy claim brought against a township police officer in the officer's personal capacity).

Defendants' motion will therefore be denied in this regard.[11]

**G.  Respondeat Superior**

Defendant Heckler argues that he cannot be sued under the theory of respondeat superior. (Defs.' Mot. to Dismiss 19.) Plaintiff specifically states in her response that she is not suing Heckler under the theory of respondeat superior. (Pl.'s Resp. 20.) Because Plaintiff has expressly

---

[11] Defendants McDonough, Zielinski, and Heckler also argue—in passing—that Plaintiff is not entitled to punitive damages because, pursuant to § 1983, punitive damages are not available when a municipal employee is sued in his official capacity. (Defs.' Mot. to Dismiss 29.) Plaintiff again stresses that she is not suing these three Defendants in their official capacities, but in their individual capacities. (Pl.'s Resp. 24–25.) Therefore, Defendants' motion will be denied in this regard.

disclaimed that she is proceeding under this theory of liability, Heckler's motion will be denied in this regard.

### H. Dismissal of Defendant Bucks County

Defendant Bucks County argues that Plaintiff has failed to plead sufficient facts to plausibly state claims against it. (Defs.' Mot. to Dismiss 19.) In her Response, Plaintiff "concedes that she has failed to state a claim against Bucks County," and does not oppose dismissal of all claims against it. (Pl.'s Resp. 19.) Bucks County will therefore be dismissed from this case.

Having disposed of the County Defendants' motion to dismiss, I will now examine the Knotts' motion to dismiss.

### IV.   ANALYSIS – THE KNOTTS' MOTION TO DISMISS

The only two claims against Defendants Kathryn and Karl Knott are Plaintiff's common law civil conspiracy claims (Counts V and VI). The Knotts have moved to dismiss both of these claims under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff has failed to articulate sufficient facts plausibly entitling her to relief.

The Knotts first argue that Plaintiff has failed to adequately allege their involvement in a conspiracy. They insist that they merely "complained to law enforcement officers that some unknown person had appropriated Kathryn's identity in order to post phony disparaging comments falsely purporting to be from Kathryn." (Defs.' Mot. to Dismiss 4.)

In response, Plaintiff points out that she alleged that the Knotts had "connections and relationships" with law enforcement personnel in Bucks County, and in particular, the other Defendants named in this case. (Pl.'s Resp. 5.) Plaintiff alleges that Kathryn Knott informed Karl Knott about the Knotty is a Tramp username with the expectation that he would use his position and influence as Chief of Police to silence the person behind the account. Relying on his

connections, Karl Knott allegedly coordinated a meeting with the District Attorney's office on February 23, 2015, to discuss the Knotty is a Tramp account. Then, on March 23, 2015, the detectives met with Kathryn Knott at her home, where they discussed the account further. After determining where the posts had come from, the detectives traveled outside of their territorial jurisdiction (allegedly at Heckler's direction) on August 6, 2015, to confront Plaintiff about the account, and threatened her with arrest. (See Am. Compl. ¶¶ 18–31, 39, 81–98.)

These facts, as alleged, reflect that each Defendant (including the Knotts) plausibly acted with the common purpose in mind of silencing the person behind the social media account. The allegations further reflect a plausible overt act done in furtherance of this common purpose—the detectives showing up at Plaintiff's work and threatening her with arrest if she continued posting comments.

Finally, the "actual legal damage" in this case corresponds to a plausible violation and infringement of Plaintiff's First Amendment rights. Thus, assuming the veracity of Plaintiff's allegations at this early stage, and drawing all reasonable inferences in her favor, I conclude that she has pled sufficient facts to make out a plausible claim for common law civil conspiracy against the Knotts. At a minimum, she has alleged enough facts to raise the reasonable expectation that discovery will reveal evidence of a conspiracy. Connelly v. Lane Const. Corp., 809 F.3d 780, 789 (3d Cir. 2016) (reiterating that a complaint may not be dismissed even if one believes it "unlikely that the plaintiff can prove [the alleged] facts or will ultimately prevail on the merits") (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)).

Next, the Knotts argue (as do the County Defendants) that Plaintiff has failed to plead facts to plausibly establish the existence of an underlying constitutional tort giving rise to the

conspiracy claims. For the same reasons discussed *supra*, the Knotts' motion will be denied in this regard because Plaintiff has pled the existence of a plausible constitutional tort.

The Knotts' final argument is that Plaintiff has only alleged that the *detectives* arguably committed a tort against her, but not the Knotts (implying that they cannot be held liable for an alleged conspiracy because they did not have any direct involvement in the underlying tort). (Defs.' Mot. to Dismiss 5.) This argument also fails. It is well settled that "[o]nce there is an agreement, a conspirator may be liable for overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." Church Mut. Ins. Co. v. Alliance Adjustment Grp., 102 F. Supp. 3d 719, 732 (E.D. Pa. 2015) (internal quotations omitted); see also Tender Touch Rehab Servs., LLC v. Brighten at Bryn Mawr, 26 F. Supp. 3d 376, 405 (E.D. Pa. 2014) ("Civil conspiracy, though typically not an independent cause of action, is a mechanism for subjecting co-conspirators to liability when one of their member[s] committed a tortious act; therefore, a plaintiff need not allege an underlying tortious claim against every co-conspirator.") (emphasis added). Accordingly, the Knotts' motion to dismiss will be denied.

## V.   CONCLUSION

Defendants McDonough, Zielinski, Heckler, and Bucks County's motion to dismiss is granted in part such that all claims against Bucks County are dismissed. The motion is denied in all other respects. Defendants Kathryn and Karl Knott's motion to dismiss is denied.

An appropriate Order follows.